**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal Nos. 17-271 & 18-41 |
| | ) | Judge Nora Barry Fischer |
| IKLAS DAVIS, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

### I.     INTRODUCTION

In this case, Defendant Iklas Davis ("Defendant") is charged in two separate indictments with being a felon in possession of firearms and ammunition in violation of 18 U.S.C. § 922(g)(1).  (Crim. No. 17-271, Docket No. 1; Crim. No. 18-41, Docket No. 1).  The charges arise from the seizure of firearms and ammunition at his Turtle Creek, Pennsylvania residence on July 26, 2016 and October 13, 2017 upon law enforcement's execution of search warrants at the residence.  (*Id.*).  Presently before the Court are two motions to suppress evidence filed by Defendant and the Government's opposition thereto.  (Crim. No. 17-271, Docket Nos. 44, 47; Crim. No. 18-41, Docket No. 22).  The Court held a motion hearing on July 11, 2018, the official transcript of which has been filed of record and considered by the Court.  (Crim. No. 17-271, Docket No. 53).  At the Court's direction, the parties submitted post-hearing proposed findings of fact and conclusions of law, (Crim. No. 17-271, Docket Nos. 54, 59; Crim. No. 18-41, Docket Nos, 31, 37), and Defendant filed a response to the Government's submission, (Crim. No. 17-271, Docket No. 60; Crim. No. 18-41, Docket No. 38).  After careful consideration of all of the parties' filings and the credible evidence of record, and for the following reasons, Defendant's Motions to Suppress (Crim. No. 17-271, Docket No. 44; Crim. No. 18-41, Docket No. 22) are denied.

1

II.    BACKGROUND

   *A. Factual Findings*

Defendant is charged in the Indictment filed at Crim. No. 17-271 with unlawful possession of all of the following on July 27, 2016: a Black Rain Ordinance, model Fallout 15 rifle, .223 caliber and .223 caliber ammunition; a Ruger, model LCP, pistol, .38 caliber and .38 caliber ammunition; and a Taurus, model 856 Hy-Lite Revolver, .38 special, and .38 caliber ammunition. (Crim. No. 17-271, Docket No. 1). In addition, he is charged in the Indictment at Crim. No. 18-41 with unlawful possession of a Ruger .45 caliber pistol and .45 caliber ammunition on October 13, 2017. (Crim. No. 18-41, Docket No. 1). He seeks suppression of those firearms and ammunition as well as any statements he made to law enforcement on the dates in question. (Crim. No. 17-271, Docket No. 44; Crim. No. 18-41, Docket No. 22).

At the hearing, the Government presented the search warrants to counter Defendants' challenges to the underlying probable cause determinations. (Govt. Exs. 7; 8). The Government also introduced evidence as to the acquisition of the challenged statements to law enforcement, including the testimony of Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Special Agent Jason Pope, formerly of the Secret Service; Sergeant Matthew Mineard of the Allegheny County Police Department; Wilkins Township Police Officer David Brokaw; and former Wilkins Township Chief of Police Edward Krancic. (Cr. No. 17-271, Docket Nos. 50; 53). The Government stipulated that it would not seek to admit a statement Defendant allegedly made to Special Agent Bryan Chomicki of the U.S. Secret Service at trial as it was made prior to Defendant being read his *Miranda* rights on October 12, 2017.[1] (Cr. No. 17-271, Docket No. 53

---

[1]    In a report dated October 16, 2017, Special Agent Chomicki writes the following:
       On October 12, 2017, following the execution of the federal arrest warrants of
       Iklas Davis and Quinyatta Rochelle, I asked Davis if he had been shot 13 times
       in one incident. He stated that he is still in a lot of pain from the shooting and

at 5-6).  Defendant did not call any witnesses nor introduce any exhibits but conducted thorough cross-examination of the Government's witnesses.  (*See id*.).  In this Court's estimation, based on their respective demeanor and testimony in response to the questioning of the attorneys and the Court at the suppression hearing, all of the testifying law enforcement officers provided credible testimony as to the events in questions, despite efforts at impeachment.  *See United States v. Garcia*, 521 F. App'x 71, 73 (3d Cir. 2013) (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985)) ("'[w]hen findings are based on determinations regarding the credibility of witnesses ... for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.'").  All of these witnesses also presented as experienced law enforcement officers.

To this end, Patrolman Brokaw has more than 20 years' experience working at police departments in Wilkins Township and O'Hara Township.  (*Id*. at 37).  Former Wilkins Township Chief of Police Krancic had 37 years of law enforcement experience, including spending the last 9 years of his career as chief of police until he retired in June of 2018.  (*Id*. at 53).  Sergeant Mineard has nearly 20 years' experience, including 14 years at the Allegheny County Police Department where he was promoted from patrol officer, to detective and then to his current position as sergeant.  (*Id*. at 26-27).  Special Agent Pope has 11 to 12 years of experience, working initially as a local police officer and detective in Roanoke, Virginia, joining the Secret Service in 2015 and then the ATF in 2018.  (Cr. No. 17-271, Docket No. 53 at 11-12).

---

that he had a hard time going to bed the night before as a result of this pain.  He then mentioned that he still fears for his life because he believes that whoever shot him, will come after him again.  I told him that we utilized the SWAT team so that there was no question that it was the police that was entering his house.  Davis stated that it was a "good idea" to use the SWAT team because if he thought that someone was coming for him, he would have gone for his gun to defend himself.

(Govt. Ex. 5).

The firearms and ammunition were recovered from Defendant's residence at 210 Briaridge Drive, Turtle Creek, Pennsylvania upon the execution of search warrants on July 27, 2016 and October 12, 2017 at that location. (Govt. Exs. 7, 8). The first search warrant was authorized by the Hon. David Cashman of the Court of Common Pleas of Allegheny County based upon an affidavit of probable cause signed by Detective T. Larsen of the Los Angeles Police Department and Officer Brokaw of the Wilkins Township Police Department. (Govt. Ex. 7). The second search warrant was authorized by U.S. Magistrate Judge Robert C. Mitchell based upon an affidavit by Special Agent Pope when he was still with the U.S. Secret Service. (Govt. Ex. 8).

The charges arise out of a law enforcement investigation by the Los Angeles Police Department into the hacking of emails and iCloud accounts of various celebrities, including Rachel Roy.[2] (Govt. Ex. 7). The affidavit of probable cause supporting the initial search warrant references the investigation leading to law enforcement attributing the hack to activity from an IP address which was associated with 210 Briaridge Drive. (*Id*.). The subsequent investigation revealed that email and cell phone accounts attributed to Quinyahta Rochelle were also accessed from the IP address. (*Id*.). Law enforcement obtained the first warrant based on this information. (*Id*.).

Officer Brokaw and Chief Krancic were both on the scene when the search warrant was executed on July 27, 2016. (Crim. No. 17-271, Docket No. 53 at 37, 54). Officer Brokaw testified that prior to that day, he had completed a background investigation of the occupants of the residence and understood that both Defendant and Rochelle were convicted felons. (*Id*. at 38). During the search, firearms and ammunition were located in various places throughout the residence which he described as a two-story, red brick house, with a half-basement/half-garage.

---

[2]     The Court notes that Ms. Roy is a fashion designer based in Los Angeles.

(*Id.* at 38, 49).  Defendant was placed in handcuffs and Officer Brokaw attempted to provide him with *Miranda* warnings but prior to completing them, Defendant interrupted him and asked to speak to an attorney.  (*Id.* at 39-41).  At that point in time, Officer Brokaw ended the conversation and the officers moved to speak to Rochelle instead.  (*Id.*).  Defendant then became upset, lifted up his shirt, showed the officers his gunshot wounds and said they couldn't protect him.  (*Id.* at 44-46, 50).

The officers proceeded to remove Rochelle from the room to question her in the basement, as she had waived her *Miranda* rights and agreed to speak to the officers.  (*Id.* at 39-40, 47).  Defendant remained on the couch in a living room of the residence.  (*Id.* at 39). Officer Brokaw estimated that they spoke to Rochelle for approximately 15 minutes at which time she stated a gun in the nightstand belonged to her mother and a rifle in the closet belonged to her father.  (*Id.* at 47).  After this questioning, Officer Brokaw escorted Rochelle back into the living room and sat her on the couch near Defendant.  (*Id.* at 47-48).  He explained that upon them re-entering the room, Defendant made a spontaneous utterance that all of the guns belonged to him.  (*Id.* at 48).  Officer Brokaw credibly denied asking Defendant any questions to prompt this statement and convincingly explained that he did not know to what Defendant was responding.[3] (*Id.*).

Former Chief Krancic similarly testified that Defendant made additional spontaneous statements while detained on the couch near Rochelle during the July 27, 2016 search at the residence.  (*Id.* at 55-56).  To this end, as noted in his report, Krancic recalled that:

---

[3]     Officer Brokaw's testimony was consistent with his written report dated July 26, 2016.  (Govt. Ex. 2 at 6-7). To this end, he wrote "Defendant was advised of his rights and asked to talk to his lawyer prior to any questions. He did get very upset and said he was shot 13 times and pulled up his shirt showing us scars from his wounds.  He said he needed to protect himself because we could not protect him." (*Id.*).  He continued that "[a]fter we talked to Rochelle she was seated next to Davis and he made a spontaneous utterance that all the guns in the house belonged to him." (*Id.*).

> During the incident on 07-27-2016 when a search warrant was being served at [the residence] in Wilkins Township Iklas Davis and Quinyahta Rochelle were being detained and sitting on a sofa in the living room area. Davis made a comment that due to being shot numerous times during a past incident if he didn't hear the SWAT trucks (sic) loud speakers, see the spot lights shining in the windows and hear the flash bang explosions he would have gotten his rifle and started shooting to protect himself against a home invasion.

(Govt. Ex. 2). Krancic conceded that he did not prepare this supplemental report until after the second search warrant was executed on October 17, 2017. (Crim. No. 17-271 at Docket No. 53 at 55-57). However, he explained that he recalled this statement during the planning of the execution of the second search warrant as it was concerning to him when considering the safety of the officers executing the warrant. (*Id*. at 55). Like Brokaw, Krancic credibly denied that any questioning prompted Defendant's statements. (*Id*. at 57).

After the execution of the search warrant, Defendant was charged with several offenses related to his possession of the firearms in state court. (*See* Crim. No. 17-271, Docket No. 46 at 7). He was released on bond while those charges were pending. (*Id*.). While that case was ongoing, law enforcement continued their investigation into Rochelle's activities. (*See* Govt. Ex. 8). As part of this continuing investigation, an application for a search warrant, including an 18-page affidavit sworn by Special Agent Pope, was presented to Magistrate Judge Mitchell. (Govt. Ex. 8).

> Pope's affidavit outlined an extensive identity theft investigation conducted by numerous law enforcement agencies, and it included evidence that both Rochelle and the defendant were involved. That evidence included the defendant's admissions to law enforcement, a search of his cellular telephone, surveillance video of Rochelle conducting fraudulent transactions, references to the 2016 Search Warrant and identify-theft related items found during that search, and connections between Rochelle and Albert McCall's identify theft operation under investigation in Ohio.

The affidavit also reported that Pope conducted a trash pull on the Residence's trash on October 2, 2017, just eight days before Judge Mitchell issued the warrant. The trash pull revealed a piece of paper containing information about the names, addresses, account numbers, expirations dates, and CVV numbers of seven individuals not associated with the Residence. Pope traced these to JP Morgan Chase Bank Visa accounts. JP Morgan Chase advised Pope that the accounts were associated with over $5,000 worth of fraud in the last thirty days, and that some of the fraud occurred in person in the Pittsburgh area.

(Crim. No. 17-271, Docket No. 54 at ¶¶ 27-28 (citing Govt. Ex. 8)). Around the same time, federal authorities adopted the initial firearms charges for federal prosecution with a federal grand jury returning the Indictment against Defendant at Crim. No. 17-271 on October 10, 2017. (Crim. No. 17-271 at Docket No. 1). When the second search was executed, it took place simultaneously with the execution of arrest warrants for Defendant and Rochelle[4] for the federal indictments charging them with violating 18 U.S.C. § 922(g)(1).

Special Agent Pope and Sergeant Mineard were both present during the execution of the search and arrest warrants on October 12, 2017. (Crim. No. 17-271, Docket No. 53 at 14, 28). The Government conceded that statements allegedly made by Defendant to Special Agent Chomicki were made prior to Defendant waiving his Miranda rights and therefore would not seek their admission at trial. *See* n.1, *supra*. However, the Government presented testimony supporting Defendant's waiver which occurred subsequent to his interaction with Special Agent Chomicki.

Special Agent Pope explained the training he has received with regard to *Miranda* throughout his career, including at the Roanoke Police Department, the Secret Service and the

---

[4] On July 2, 2018, Rochelle pled guilty to violating 18 U.S.C. § 922(g)(1) on July 26, 2016 as well as numerous related counts at a separately filed information including conspiracy; use of unauthorized access devices; aggravated identity theft; and accessing protected computers without authorization. (*See* Docket Reports, Crim. Nos. 17-277 & 18-117). Based on this Court's review of the docket reports, Rochelle's sentencing before the Hon. Arthur J. Schwab of this Court is presently set for November 26, 2018.

ATF.  (Crim. No. 17-271, Docket No. 53 at 12).  He told the Court how he typically seeks to

obtain a *Miranda* waiver from a detained individual which includes: utilizing a form; asking each

of the questions to the individual to ensure they understand the rights they may be waiving; and,

having a second law enforcement officer observe and sign off on the form.  (*Id*. at 12-13).

Special Agent Pope testified that he used these procedures when discussing the *Miranda* waiver

form that Defendant executed on October 12, 2017 and was admitted into evidence as Govt. Ex.

6.[5]  (*Id*. at 14-15).  Sergeant Mineard confirmed that Special Agent Pope asked Defendant each

of the questions and that he (Sergeant Mineard) signed off on the form as a witness.  (*Id*. at 26-

35).  Special Agent Pope stated that the interview with Defendant was "non-confrontational" and

that Sergeant Mineard had a good rapport with Defendant from their past dealings.  (*Id*. at 15).

Indeed, Sergeant Mineard advised that he found Defendant to be articulate and intelligent.  (*Id*. at

35).

With respect to the interview, Special Agent Pope advised Defendant that he was not

interested in discussing the pending charges, i.e., the firearms and ammunition charges from the

July 27, 2016 search; rather, Special Agent Pope wanted to discuss various financial and

computer crimes which were the subject of the search warrant.  (Govt. Ex. 4).  After providing

the agent with information concerning those subjects, SA Pope asked Defendant generally if

there was anything else illegal in the residence.  (*Id*.).  As SA Pope noted in his report:

---

[5]        The questions on the form are the following:
            You must understand your rights before we ask you any questions.
            You have the right to remain silent.
            Anything you say can and will be used against you in a court of law.
            You have the right to talk to a lawyer and have him present with you while you
            are being questioned.
            If you cannot afford to hire a lawyer, one will be appointed to represent you
            before any questioning, if you wish.
            You can decide at any time to stop the questioning and not answer any questions
            or make any statements.
(Govt. Ex. 6).

When asked if there was anything else illegal in the house to include any drugs or weapons, he advised that there was a firearm in the house. When asked to be specific about the firearm he explained that it was in his master bedroom closet and that he had actually grabbed it this morning in a reaction hearing someone at this house this morning. He stated that upon realizing that it was the Police at his house he put the gun back. Davis stated that the gun was his cousin Coles['], and that they had recently been to the shooting range. Coles had then left the gun at Davis's house. I confronted Davis about the fact that him going to the shooting range and possessing a firearm was illegal due to him being a felon and he just said, that he needed the gun for protection and that he goes to the range to ensure he can hit what he is shooting at.

(Govt. Ex. 4). The second federal indictment against Davis relates to firearms and ammunition seized during the execution of the second search warrant on October 13, 2017.[6] (Crim. No. 18-41 at Docket No. 1).

### B.    Relevant Procedure

After receiving several extensions of time to file pretrial motions in both cases, Defendant separately filed motions to suppress evidence and motions to dismiss at both cases on May 30, 2018. (Crim. No. 17-271, Docket Nos. 44, 45; Crim. No. 18-41, Docket Nos. 22, 23). The Government filed its omnibus responses on June 15, 2018. (Crim. No. 17-271, Docket No. 48; Crim. No. 18-41, Docket No. 26). The Court held a motion hearing on July 11, 2018 and the official transcript of the proceeding was filed on July 17, 2018. (Crim. No. 17-271, Docket Nos. 50, 53; Crim. No. 18-41, Docket No. 28). At the conclusion of the hearing, the Court entered Orders denying Defendant's motions to dismiss. (Crim. No. 17-271, Docket No. 51; Crim. No. 18-41, Docket No. 29).

Pursuant to the Court's directives, the Government filed its proposed findings of fact and conclusions of law on August 7, 2018. (Crim. No. 17-271, Docket No. 54; Crim. No. 18-41,

---

[6]    At this point, Davis has not been charged with identity theft and related offenses based on the evidence which was uncovered from the second search.

Docket No. 31). The Court granted Defendant an extension of time to file his proposed findings of fact and conclusions of law, which he ultimately filed on August 23, 2018. (Crim. No. 17-271, Docket No. 59; Crim. No. 18-41, Docket No. 37). Defendant then submitted his additional findings of fact and conclusions of law and response to the Government's submission on August 31, 2018. (Crim. No. 17-271, Docket No. 60; Crim. No. 18-41, Docket No. 38). As the matter has been fully briefed and argued, it is now ripe for disposition.

III.   LEGAL STANDARD

It is well-settled that, at a hearing on a motion to suppress, "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *United States v. Richardson*, 501 F. Supp. 2d 724, 734 (W.D. Pa. 2007) (citations omitted).

IV.   DISCUSSION

As noted, Defendant has filed two separate suppression motions challenging searches and seizures of evidence, including statements he made to law enforcement, which occurred on separate dates, July 26, 2016 and October 12, 2017. (Crim. No. 17-271, Docket No. 44; Crim. No. 18-41, Docket No. 22). Davis generally argues that the warrants were not supported by probable cause; that the items seized (firearms and ammunition) were not authorized by the warrants and not illegal under PA law; that the information supporting the warrant was "stale"; and that the statements taken from him were made in violation of his *Miranda* rights, which he claims were either not read to him or not knowingly and voluntarily waived. (*Id.*). In response, the Government maintains that the warrants were supported by probable cause; the firearms and ammunition were contraband (possessed illegally under both federal and state law) appropriately seized under the "plain view" doctrine; and that the officers otherwise acted in good faith relying

upon the warrants in conducting the searches and seizures. (Crim. No. 17-271, Docket No. 48; Crim. No. 18-41, Docket No. 26). With respect to the statements, the Government argues that the statements made by Defendant on July 27, 2016 were spontaneously made by Defendant and that he knowingly and voluntarily waived his *Miranda* rights during the second episode on October 12, 2017. (*Id.*). Having carefully considered the parties' positions in light of the evidence of record, the Court agrees with the Government and will deny the suppression motions.

### A.  July 2016 Search and Seizure

Defendant lodges three essential arguments supporting his motion to suppress the firearms and ammunition seized on July 27, 2016: that the warrant was not supported by probable cause; that the information in the affidavit was stale; and that the seized ammunition and firearms were not listed as items to be seized under the warrant and the presence of these items in the residence was not illegal. (Crim. No. 17-271, Docket Nos. 44, 59, 60). The Government contests each of these points and further maintains that the good faith exception to the exclusionary rule suffices to provide an alternative basis to uphold the warrant. (Crim. No. 17-271, Docket Nos. 48, 54).

 "A magistrate's 'determination of probable cause should be paid great deference by reviewing courts.'" *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)). A trial court exercises "only a deferential review of the initial probable cause determination made by the magistrate." *United States v. Conley*, 4 F.3d 1200, 1205 (3d Cir. 1993) (citing *Gates*, 462 U.S. at 236) (emphasis in original). "[T]he duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed." *Gates*, 462 U.S. at 238 (quoting *Jones v. United*

*States*, 362 U.S. 257, 271 (1960)). The deference given to a magistrate's issuance of a warrant "does not mean that reviewing courts should simply rubber stamp a magistrate's conclusions." *United States v. Miknevich*, 638 F.3d 178, 182 (3d Cir. 2011). Still, "the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *United States v. Jones*, 994 F.2d 1051, 1055 (3d Cir. 1993).

A magistrate's role in issuing a warrant is to "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. A warrant is to be upheld on review "as long as there is a substantial basis for a fair probability that evidence will be found." *Conley*, 4 F.3d at 1205. In conducting this assessment, a reviewing court is confined "to the facts that were before the magistrate judge, i.e., the affidavit, and [the court may] not consider information from other portions of the record." *Jones*, 994 F.2d at 1055. Stated otherwise, the District Court is restricted to viewing only the information confined by the "four corners" of the affidavit before the magistrate. *United States v. Whitner*, 219 F.3d 289, 295-96 (3d Cir. 2000). "The supporting affidavit to a search warrant is to be read in its entirety and in a common sense, nontechnical manner." *Miknevich*, 638 F.3d at 182. This includes "all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information." *Gates*, 462 U.S. at 238-39. Further, "probable cause is a fluid concept that turns on the assessment of probabilities in particular factual contexts not readily, or even usefully, reduced to a neat set of legal rules." *Miknevich*, 638 F.3d at 182 (internal quotations omitted) (quoting *United States v. Shields*, 458 F.3d 269, 277 (3d Cir. 2006)). Proof beyond a reasonable doubt is not required. *Id.*

In this Court's estimation, after reviewing the four corners of the affidavit supporting the search warrant, the information contained therein plainly suffices to establish probable cause that evidence of the hacking would be found upon a search of the residence at 210 Briaridge Dr. in June of 2016. (Govt. Ex. 7). To this end, the investigation by the LAPD with the assistance of local Wilkins Township officers established that an IP address associated with the residence was used at the time of the hack (in April 2016) to access Ms. Roy's cell phone. (*Id*.). The residence was linked by way of an investigation of the internet service provider, Verizon, and the email addresses determined to have been accessed from that IP address were attributable to at least one of its residents, i.e., Quinyahta Rochelle. (*Id*.).

Defendant suggests that the information was stale because the IP address had been reassigned to another customer in June of 2016 living at a different location in North Versailles. (Crim. No. 17-271, Docket Nos. 44, 59, 60). However, as the Government points out, the information concerning the reassignment of the IP address was provided to Judge Cashman and his conclusion that the warrant was supported by probable cause, despite the reassignment of the IP address, is due deference by this Court. (Crim. No. 17-271, Docket Nos. 48, 54). Moreover, the information contained in the warrant was not "stale" under Third Circuit precedent and this Court's prior decisions:

> Age of the information supporting a warrant application is a factor in determining probable cause. If too old, the information is stale, and probable cause may no longer exist. Age alone, however, does not determine staleness ... Rather, we must also examine the nature of the crime and the type of evidence.

*United States v. Zimmerman*, 277 F.3d 426, 434 (3d Cir. 2002) (internal citations omitted). Our court of appeals has not adopted "bright line rules" delineating a length of time to determine staleness. *Id.* at 435. "Additionally, courts have recognized that continued criminal activity in the

intervening period undermines a claim of staleness," with this Court finding that an eight-month period of time between a controlled buy and the execution of a search warrant at a drug dealer's residence did not render the information stale, as he was continuing to engage in narcotics trafficking during that period. *United States v. Gorny*, Crim. No. 13-70, 2014 WL 2860637, at *8 (W.D. Pa. 2014) (referencing Cr. No. 12-272 *U.S. v. Raheem Brown*); *see also United States v. Urban*, 404 F.3d 754, 773 (3d Cir. 2005) ("[W]here the facts adduced to support probable cause describe a course or pattern of ongoing and continuous criminality, the passage of time between the occurrence of the facts set forth in the affidavit and the submission of the affidavit itself loses significance."). This Court also held in a child pornography case that an interval of approximately 9 months between the internet activity and the submission of the application did not render the information stale, particularly given the declarations of the experienced affiant that child pornographers tend to hoard that type of information over longer periods of time. *See United States v. Coca*, 2016 WL 7013037, at *5 (W.D. Pa. Dec. 1, 2016). Overall, it is well settled that "staleness is not a matter of mechanically counting days." *Id.* (quoting *Vosburgh*, 602 F.3d at 528 (citing *Zimmerman*, 277 F.3d at 434)). Instead, the import of the date of the information must be assessed in context and through the totality of the information provided to the judicial officer. *Id.* Further, "[o]n the intersection between the passage of time and technology, we have noted that computers have 'long memor[ies].'" *United States v. Ruffin*, 664 F. App'x 224, 227 (3d Cir. 2016), *cert. denied*, 137 S. Ct. 1120, 197 L. Ed. 2d 220 (2017) (quoting *United States v. Vosburgh*, 602 F.3d 512, 529 (3d Cir. 2010) (alteration in original)).

Here, the totality of the circumstances demonstrate that the warrant was not stale in that the experienced law enforcement officers acknowledged to Judge Cashman that the IP address had been reassigned but confirmed that Rochelle still lived at the address five days prior to the

execution of the warrant and that she would likely still possess the devices used to access the internet over the IP address and potentially other contraband used to commit these crimes within the residence. (Govt. Ex. 7). In short, while the IP address was reassigned to North Versailles, the experienced officers were not searching for the IP address but for computers and other electronic devices used to commit these crimes through the IP address and other electronic evidence of same. (*Id*.). Since computers, cell phones and other electronic devices have "long memories," a period of a little over a month after the reassignment of the IP address does not undermine the probable cause determination here as there was a "fair probability" that evidence of the unauthorized access of the computer devices would be found. *See Ruffin*, 664 F. App'x at 227.

It is also well established that although the warrant did not expressly authorize the seizure of the firearms and ammunition, that the law enforcement officers were able to seize any contraband or other evidence that they observed in plain view from their lawful position within areas of the residence authorized by the warrant while executing same. *See Harris v. United States*, 390 U.S. 234, 236, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968) (per curiam) ("It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence."). The "test for the application of the plain view doctrine [is]: (1) prior justification for the government's intrusion into an otherwise protected area (such as a home); and (2) the immediately apparent incriminating nature of evidence." *United States v. Wadley*, Cr. No. 07-166, 2007 WL 4593508, at *7 (W.D. Pa. Dec. 28, 2007). The warrant at issue is broad in scope and authorized the search of the residence "to include any and all rooms, safes, attics, basements, and other parts therein" and the seizure of "computer devices, including desktops, laptops, tablets, cell phones …

[e]xternal storage devices; to include portable storage such as external hard drives, flash drives, and digital memory cards where information of unauthorized computer access may be stored" and "[a]ll indicia of ownership and control for the computer devices and the storage devices." (Govt. Ex. 7). Thus, the presence of the officers within the residence while executing a valid search warrant, which permitted searches of the closets and nightstand, was clearly justified and fell within the scope of the warrant.

Although Defendant argues that the presence of the firearms in the residence did not violate Pennsylvania law, Officer Brokaw credibly explained that he had completed a background investigation of the occupants of the residence and understood that both Defendant and Rochelle were convicted felons. (Crim. No. 17-271, Docket No. 53 at 38). As the Government highlights, Defendant is also incorrect as he was previously convicted of theft by unlawful taking and thereby was precluded from possessing such a firearm pursuant to 18 Pa.C.S.A. § 6105(a)(1).[7] Defendant further seizes on a statement in one of the reports that LAPD Detective Larsen advised Officer Brokaw that he was requesting a local search warrant because he was told that standards for a federal search warrant were not satisfied. (*See* Govt. Ex. 1). It is not clear to what Detective Larson is referring in this statement[8] but the federal standards of probable cause, set forth above, are plainly established in this case.

---

[7]     Specifically, section 6105(a)(1) provides that:

> A person who has been convicted of an offense enumerated in subsection (b), within or without this Commonwealth, regardless of the length of sentence or whose conduct meets the criteria in subsection (c) shall not possess, use, control, sell, transfer or manufacture or obtain a license to possess, use, control, sell, transfer or manufacture a firearm in this Commonwealth.

18 Pa.C.S.A. § 6105(a)(1). Further, offenses enumerated in section 6105(b) include, among others, "section 3921 (relating to theft by unlawful taking or disposition) upon conviction of the second felony offense." 18 Pa.C.S.A. § 6105(b).

[8]     In the Incident Report, Officer Brokaw states the following:

> Today I got the cell phone number of LAPD detective T. Larsen [REDACTED] and called him. He told me that he is a Los Angeles Police detective attached to a federal electronics task force that deals with computer crimes against celebrities. He is working on a case where a celebrity's computer was hacked

Defendant's final effort, set forth in his response to the Government's proposed findings of fact and conclusions of law, is that the firearm seized from the nightstand was located after he made an un-*Mirandized* statement to the officers which he argues should justify suppression under the fruit of the poisonous tree doctrine. The Court disagrees with this assertion as well for several reasons. First, Defendant did not raise this particular argument in his initial motion and brief and arguably waived it. *See United States v. Dupree*, 617 F.3d 724, 732 (3d Cir. 2010) (citing Fed. R. Crim. P. 12(e) (providing that "a party waives any [motion to suppress] defense, objection, or request not raised by the deadline" set by the district court). Second, the warrant is broad in scope and authorized the search of the entire residence, including the nightstand, as noted above. *See* p. 15-16, *supra*. Third, "a violation of *Miranda* is not sufficient to preclude evidence obtained as a result of statements given absent a proper warning." *United States v. Aker*, No. CV 3:16-CR-00206, 2018 WL 501001, at *9 (M.D. Pa. Jan. 22, 2018) (citing cases); *United States v. DeSumma*, 272 F.3d 176, 178 (3d Cir. 2001) ("[T]he fruit of the poisonous tree doctrine does not apply to derivative evidence secured as a result of a voluntary statement obtained before *Miranda* warnings are issued."). "In other words, a statement made absent *Miranda* warnings is not enough to suppress non-testimonial-derivative evidence; a showing of actual coercion is required." *Aker*, 2018 WL 501001, at *9.

---

by an IP address that comes back to [REDACTED]. He is not sure where the case is going to go but wanted to reach out and have a contact here in case it is needed. He is seeking approval from the D.A.'s Office in Los Angeles to have this case handled by them. Which would include him flying here, interviewing the suspects and extraditing them back to California to be prosecuted. He told me that this case does not fit the federal guidelines for search warrants so he may need assistance with a local search warrant. If the case is not accepted by the LA DA then it could be turned over to us. I advised him that would likely mean Wilkins Township turning it over the the (sic) Allegheny County Police but we would deal with that when the time comes.

(Govt. Ex. 1 at 5).

The Government alternatively argues that even if the Court concludes that the warrant lacked probable cause, that the good faith exception to the warrant requirement should be applied to preclude the suppression of the challenged evidence. (Crim. No. 17-271, Docket Nos. 48, 54). In this regard,

> The Supreme Court has held that evidence derived from a warrant not supported by probable cause is still admissible when obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate judge. *United States v. Leon*, 468 U.S. 897, 926 (1984). "[T]he purpose of the exclusionary rule- to deter police misconduct—would not be furthered by suppressing evidence obtained during a search 'when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope.'" *United States v. Tracey*, 597 F.3d 140, 150 (3d Cir. 2010) (quoting *Leon*, 468 U.S. at 919–20).

> The question is "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 922. Indeed, "[t]he mere existence of a warrant typically suffices to prove that an officer conducted a search in good faith and justifies application of the good faith exception." *United States v. Hodge*, 246 F.3d 301, 307-308 (3d Cir. 2001) (citing *Leon*, 468 U.S. at 922). The United States Court of Appeals for the Third Circuit has recognized that the good faith exception does not apply in four limited circumstances:

>> 1) where the magistrate judge issued the warrant in reliance on a deliberately or recklessly false affidavit;
>> 2) where the magistrate judge abandoned his or her judicial role and failed to perform his or her neutral and detached function;
>> 3) where the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or
>> 4) where the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.

> *Tracey*, 597 F.3d at 151 (citations omitted). These limited exceptions "involve conduct that is 'deliberate, reckless, or grossly

negligent.'" *Id.* (quoting *Herring v. United States*, 555 U.S. 135 (2009)).

*United States v. Gardenhire*, No. CR 15-87, 2017 WL 1105733, at *15 (W.D. Pa. Mar. 24, 2017).

In light of the totality of the circumstances set forth in the warrant, it is this Court's opinion that if the warrant was deemed insufficient, the good faith exception would apply to defeat the present suppression motion. The factual record simply does not support a finding that one of the four limited circumstances which permit the avoidance of the good faith exception apply here. *See e.g., Tracey*, 597 F.3d at 151. There is also no evidence of conduct of law enforcement officers that was deliberate, reckless or grossly negligent. To the contrary, the record developed at the hearing showed professional and appropriate law enforcement actions in executing a search warrant. Accordingly, Defendant's motion to suppress the evidence seized during the July 27, 2016 search is denied.

### B. July 2016 Statements

Defendant next seeks to suppress the statements he made to agents during the execution of the search warrant in July of 2016. (Crim. No. 17-271, Docket Nos. 44, 59, 60). The Government has identified two such statements that it intends to introduce at trial, including statements made to Officer Brokaw and to former Chief Krancic. (Crim. No. 17-271, Docket Nos. 48, 54). The Government maintains that these statements were made voluntarily by Defendant and thus were not made in violation of his Constitutional rights to self-incrimination. (*Id*.). The Court once again agrees with the Government.

As this Court has previously recognized,

> [t]he Supreme Court has determined that a suspect must be given specific warnings of his Fifth Amendment rights prior to a "custodial interrogation." *Miranda v. Arizona*, 384 U.S. 436, 444,

86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The Court further explained "[b]y custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* The Court later clarified that "the term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). The Government bears the burden of showing that a statement given prior to *Miranda* warnings is admissible. *United States v. Shaird*, 463 F. App'x. 121, 123 (3d Cir. 2012) (unpublished) (citing *Brown v. Illinois*, 422 U.S. 590, 604, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)).

Certain questions asked by the authorities do not require Miranda warnings. The "public safety" exception permits questions that are necessary to protect either the public or police from eminent danger. *New York v. Quarles*, 467 U.S. 649, 656–57, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984); *see also United States v. Pete*, No. 09–CR–82, 2010 WL 887364, at *6, n. 2 (W.D.Pa. Mar.10, 2010) (unpublished) (holding that no Miranda warning was necessary to ask whether defendant was armed after seeing permit to carry a firearm), *aff'd* 463 F. App'x. 113 (3d Cir.2012) (unpublished). "[B]iographical data necessary to complete booking or pretrial services" fall within the "routine booking question" exemption of questions not falling within Miranda's protections. *Pennsylvania v. Muniz*, 496 U.S. 582, 601, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990). Furthermore, "[v]olunteered statements of any kind are not barred by the Fifth Amendment." *Miranda*, 384 U.S. at 478. Thus, if Defendant spontaneously made his statements without being prompted by an interrogation, these statements would be admissible. *See Brown v. Phelps*, No. A–08–596–GMS, 2011 WL 6069072, at *5 (D. Del. Dec.2, 2011) (unpublished) ("Significantly, spontaneous statements that were not made in response to interrogation or its functional equivalent are not barred by Miranda") (citing *Innis*, 446 U.S. at 299–301).

*United States v. Stanton*, No. CRIM. 11-57, 2013 WL 228241, at *4–5 (W.D. Pa. Jan. 22, 2013).

In this Court's estimation and after carefully evaluating the credibility and demeanor of

Officer Brokaw and former Chief Krancic, both of whom this Court found to be credible and

forthright witnesses, the Government has demonstrated by a preponderance of the evidence that

both of the challenged statements were made voluntarily by Defendant. *Id.* To this end, both witnesses testified consistently with the reports that they prepared and former Chief Krancic persuasively explained why his report was produced around the time of the execution of the second search warrant. Further, there is no evidence in this record that Defendant was questioned at all or subject to coercive police tactics which would justify suppression during the episode on July 27, 2016. Indeed, the record demonstrates that Officer Brokaw started to provide Defendant with *Miranda* warnings but he stopped doing so after Defendant requested the ability to speak with his lawyer. (Crim. No. 17-271, Docket No. 53 at 39-41, 44-46, 48, 50). The fact that Defendant subsequently made incriminating statements, because he was upset, or otherwise, does not support a constitutional violation. Therefore, Defendant's motion to suppress these statements is also denied.

### C. October 2017 Search Warrant

Defendant offers two brief and unsupported challenges to the October 2017 search warrant authorized by Magistrate Judge Mitchell, both of which the Government opposes and can be handled with dispatch by the Court. (Crim. No. 18-41, Docket No. 22, 25, 31, 37, 38). First, Defendant argues that probable cause is not sustained because the warrant relies upon allegedly unconstitutionally seized evidence and statements from the July 27, 2016 search at the residence. (Crim. No. 18-41, Docket Nos. 22, 37, 38). As the Court has already explained why none of those actions violated Defendant's constitutional rights above, this derivative claim must be denied as well. *See* §§ IV.A, IV.B, *supra*. Second, as with the earlier warrant, Defendant argues that the seizure of firearms and ammunition is outside the scope of the warrant. (*Id.*). Once again, the Court has reviewed the four corners of the warrant and supporting affidavit and finds that the warrant was sufficiently broad to encompass the seizure of such contraband from

the residence which was located in plain view. (Govt. Ex. 8). Accordingly, Defendant's motion to suppress the evidence seized under the October 2017 search warrant is denied.

### D. October 2017 Statements

In his initial motion, Defendant argued that statements he made to law enforcement on October 12, 2017 were unconstitutionally obtained because they were the fruits of the illegal execution of a search warrant on that date and that he was not advised of his *Miranda* rights nor did he knowingly and voluntarily waive those rights at the time. (Crim. No. 18-41, Docket No. 22). The Government maintains that Defendant knowingly and voluntarily waived his *Miranda* rights prior to speaking to law enforcement and supported such position by presenting the testimony of Special Agent Pope and Sergeant Mineard as well as the *Miranda* rights form Defendant executed prior to making statements to law enforcement officers on that date. (*See* Crim. No. 17-271, Docket No. 53). Subsequent to the hearing, the parties were directed to file additional briefing and while Defendant filed both findings of fact and conclusions of law and a response to the Government's submission, he has not further addressed his claims with respect to these matters. (Crim. No. 18-41, Docket Nos. 37, 38). While the Court questions if this position has been abandoned by the defense, the credible evidence of record plainly establishes that Defendant knowingly and voluntarily executed the waiver of rights form and agreed to speak to the officers such that his motion must be denied.

As this Court has held,

> [i]t is the Government's burden to establish that the defendant "'in fact knowingly and voluntarily waived [Miranda] rights' when making the statement," by a preponderance of the evidence. *Berghuis v. Thompkins*, 560 U.S. 370, 130 S.Ct. 2250, 2260, 176 L.Ed.2d 1098 (2010) (citing *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979)). The waiver inquiry has "two distinct dimensions:" it must be "made with a full awareness of both the nature of the right being abandoned and the

consequences of the decision to abandon it" and "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Fahy v. Horn*, 516 F.3d 169, 194 (3d Cir. 2008) (citing *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)). "[A] heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda v. Arizona*, 384 U.S. 436, 475, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

*United States v. Haddix*, No. CRIM. 12-75, 2013 WL 3177749, at \*5 (W.D. Pa. June 24, 2013).

The Supreme Court has made clear that a statement is involuntary when the suspect's "will was overborne in such a way as to render his confession the product of coercion." *Arizona v. Fulminante*, 499 U.S. 279, 288, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). Courts must look at "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Dickerson v. United States*, 530 U.S. 428, 434, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). When viewing the totality of the circumstances, the Supreme Court has identified "some of the traditional indicia of coercion: 'the duration and conditions of detention ..., the manifest attitude of the police toward him, his physical and mental state, the diverse pressures which sap or sustain his powers of resistance and self-control.'" *Colorado v. Spring*, 479 U.S. 564, 574, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987) (citing *Culombe v. Connecticut*, 367 U.S. 568, 602, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961)). The Third Circuit has also specified that additional circumstances to consider include the "suspect's background and experience, including prior dealings with the criminal justice system," *United States v. Jacobs*, 431 F.3d 99, 108 (3d Cir.2005), as well as "the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health." *Lam v. Kelchner*, 304 F.3d 256, 264 (3d Cir.2002) (citing *Withrow v. Williams*, 507 U.S. 680, 693, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993) (some internal citations omitted)).

*Id.* at \*6.

In this Court's estimation, Special Agent Pope and Sergeant Mineard offered credible and uncontradicted testimony regarding Defendant's execution of the *Miranda* waiver of rights form. To this end, Special Agent Pope detailed the procedures he utilizes to obtain consent from a detained individual for questioning and the training he has received in such matters over his lengthy law enforcement careers. (Crim. No. 17-271, Docket No. 53 at 12-15). Both he and Sergeant Mineard testified that those procedures were employed prior to asking Defendant any questions and that he knowingly and voluntarily signed the form and verbally agreed to speak to the law enforcement officers. (*Id*. at 14-15, 26-35; Govt. Ex. 6). They confirmed that Defendant and Sergeant Mineard had a nice rapport, were familiar with each other from prior matters, and that they engaged in a "non-confrontational" interview. (*Id*. at 15, 35). Sergeant Mineard testified that Defendant presented as articulate and intelligent and nothing was introduced into the record to refute such characterization. (*Id*. at 35). All told, after consideration the totality of the circumstances, the Court finds that the Government has proven by a preponderance of the evidence that Defendant knowingly and voluntarily executed the *Miranda* waiver and submitted to questioning by the officers. *See Haddix*, 2013 WL 3177749, at *5. Therefore, his motion to suppress such statements must be denied.

V.    CONCLUSION

Based on the foregoing, Defendant's motions to suppress evidence, (Crim. No. 17-271, Docket No. 44; Crim. No. 18-41, Docket No. 22), are denied. Appropriate Orders follow.

*s/Nora Barry Fischer*
Nora Barry Fischer
U.S. District Judge

Date:   October 2, 2018

cc/ecf: All counsel of record